ACCEPTED
12-15-00157-CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
10/15/2015 1:20:28 PM
Pam Estes
CLERK

_____

**12-15-00157-CR**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
10/15/2015 1:20:28 PM
PAM ESTES
Clerk

_____

# IN THE COURT OF APPEALS
# FOR THE TWELFTH JUDICIAL DISTRICT
# TYLER, TEXAS

_____

## STANFORD JONES, SR.
### v.
### The State of Texas

---

## APPEAL FROM THE 159th DISTRICT COURT
## OF ANGELINA COUNTY, TEXAS
## Cause No. 2013-0744

---

## AMENDED BRIEF OF APPELLANT
## STANFORD JONES, SR.

_____

Respectfully, Submitted:
*/S/ John D. Reeves*
JOHN D. REEVES
Attorney at Law
1007 Grant Ave.
Lufkin, Texas 75901
Phone: (936) 632-1609
Fax: (936) 632-1640
SBOT # 16723000
Email:     tessabellus@yahoo.com
**ATTORNEY FOR APPELLANT**

**ORAL ARGUMENT NOT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

**Parties:**

Appellant in Trial Court:

Stanford Jones, Sr.

TDCJ# 01836270

Appellee in Trial Court:

The State of Texas

**Trial and Appellate Counsel**:

**Appellant**:

JOHN D. REEVES                                        **Trial**  John W. Tunnell
Attorney at Law                                              Attorney at Law
1007 Grant Ave                                               P.O. Box 414
Lufkin, Texas 75901                                          Lufkin, Texas 75901
Phone: (936) 632-1609                                        Phone: 936/699-3131
Fax: (936) 632-1640                                          SBOT: 20292100
SBOT # 16723000

**Appellee**:

April Ayers- Perez                                   **Trial**  John Peralta
Asst.  Angelina County  District Atty.                Asst. Angelina County District Atty.
P.O. Box 908                                                  P.O. Box 908
Lufkin, Texas 75901                                          Lufkin, Texas 75901
Phone:  936-632-5090                                         Phone: 936/ 632-5090
SBOT#                                                        SBOT# 15771250

# TABLE OF CONTENTS

Page:

IDENTITY OF PARTIES AND COUNSEL……………………………………… ii

TABLE OF CONTENTS……………………………………………….......iii

INDEX OF AUTHORITIES…………………………………………... iv-v

STATEMENT OF THE CASE……………………………………….....1-2

STATEMENT OF JURISDICTION…………………………………………2

ISSUE PRESENTED...........................................................................2

STATEMENT OF FACTS …………………………………….…3-29

SUMMARY OF THE ARGUMENT ………………………….......29-30

ARGUMENT………………………………………………30-45

CONCLUSION AND PRAYER………………………………………45

CERTIFICATE OF COMPLIANCE………………………………………46

CERTIFICATE OF SERVICE…………………………………………..46

# INDEX OF AUTHORITIES

Page:

**U.S. Supreme Court Cases**

Jackson v. Virginia, 443 U.S. 307, (1979)……………………..……….31,38

**Texas Cases**

Campbell v. State, 382 S.W.3d 545,  (Tex. App.-Austin 2012, no pet.) ………..42

Ellingsworth v. State, 487 S.W.2d 108, (Tex. Crim. App. 1972) ……………....41

Gonzalez v. State, 337 S.W.3d 473, (Tex. App.-Houston [1 Dist.] 2011) ..31,32

Hooper v. State, 214 S.W.3d 9, (Tex. Crim. App. 2007)……………..……....31

Malik v. State, 953 S.W.2d 234, (Tex. Crim. App. 1997)…………………….32

Malone v. State, 253 S.W.3d 253, (Tex. Crim. App. 2008)…………………..38

Martinez v. State, 327 S.W.3d 727, (Tex. Crim. App. 2010) ……………..…..41

Montgomery v. State, 810 S.W.2d 372, (Tex. Crim. App. 1990)

(op. on reh'g). ………………………………………………..……..……….41

Moore v. State, 652 S.W.2d 411, (Tex. Crim. App. 1983) ……………..……42

Moses v. State, 105 S.W.3d 622, (Tex. Crim. App.  2003) ..……………….…41

Osteen v. State, 61 S.W.3d 90, (Tex. App.—Waco 2001, no pet.). …………..41,42

Shea v. State, 167 S.W.3d 98, (Tex. App.-Waco 2005, pet. ref'd……………….43

Taylor v. State, 268 S.W.3d 571, (Tex. Crim. App. 2008) ……………..……41

iv.

Thomas v. State, 444 S.W.3d 4, (Tex. Crim. App. 2014) ………………….31

Tienda v. State , 358 S.W.3d 633 (2012) …..……………………..………43,45

Williams v. State, 235 S.W.3d 742, (Tex. Crim. App. 2006) ………..32,37,38

## RULES AND OTHER AUTHORITIES

Tex. Penal Code Ann. Section 28.02 ( West 2011) ……..………..………….30

Tex. Rules Evidence 613(a) …..………………………..…….…..……….38,41

Tex. Rules Evidence 901…..……………………………………...……….43

v.

_____

**12-15-00157-CR**

_____

# IN THE COURT OF APPEALS
# FOR THE TWELFTH JUDICIAL DISTRICT
# TYLER, TEXAS

_____


Stanford Jones, Sr.

v.

The State of Texas

_____


APPEAL FROM THE 159th DISTRICT COURT
OF ANGELINA COUNTY, TEXAS
Cause No. 2013-0725

_____

BRIEF OF APPELLANT
STANFORD JONES, SR.

_____

TO THE HONORABLE COURT OF APPEALS;

## STATEMENT OF THE CASE

Appellant was indicted by a grand jury in the October/ December term for six counts of Arson. (CR p. 19-21) On June 3, 2014, Appellant waived arraignment and entered a plea of not guilty on all counts. (CR p. 6) A jury was selected on March 23, 2015. ( RR Vol. 2) A jury trial began on March 23,2014 and concluded on March 25, 2015. Appellant was found guilty on counts I,II,V of a six count indictment for the offenses of arson.. (RR Vol. 5 p.119) The state

abandoned count IV and appellant was found not guilty on counts III and VI.. A sentencing hearing was conducted on May 15, 2015 and appellant was sentenced to twenty years in the ID-TDJC.( RR Vol. 6)    Notice of Appeal was filed on June 10, 2015.  (CR p. 115) John Reeves was appointed to represent Appellant on June 10, 2015. (CR p. 114)

## STATEMENT OF JURISDICTION

The Trial Court Certification was signed by the trial court on June 10, 2015 and states that the case was not a plea bargain case, and the defendant has the right of appeal.  (CR p. 119-120)

## ISSUE PRESENTED

### Issue 1

**The evidence is legally insufficient to prove the three offenses of Arson as alleged in count I, II and V in the indictment.**

### Issue 2
**The trial court erred in permitting impermissible impeachment evidence.**

### Issue 3

**The trial court erred in allowing face book prints which were not properly authenticated**.

2.

## STATEMENT OF FACTS

The case was called for trial upon an indictment charging appellant with six counts of arson ,of which appellant was convicted of three. 1) with intent to damage or destroy a habitation located in Lufkin, Texas, start a fire by igniting a stick with leaves and other items against said habitation, knowing that said habitation was within the limits of an incorporated city or town, 2) with intent to damage or destroy a building located in Lufkin, Texas, start a fire by putting accelerant on said building and lighting it knowing that said building was within the limits of an incorporated city or town, 5) with intent to damage or destroy a habitation located in Lufkin, Texas, start a fire by igniting a piece of carpet, rug or paper, knowing that said habitation was within the limits of an incorporated city or town. (RR Vol. 3, p. 21-24) The testimony considered by the jury on guilt/innocence consisted of twenty witnesses beginning with the testimony of Officer Sean Alexander of the Lufkin Police Department (LPD). (RR Vol. 3, p. 32-40)

Officer Alexander testified he had been employed with LPD for nine years. (RR Vol. 3, p. 32-33) He was dispatched on November 13, 2012 to 907 O'Quinn where he made contact with the homeowner, Samuel Gilmore, who stated that he thought his house had caught fire. (RR Vol. 3, p. 33-34) The Officer observed some ash and scorching on the side of the house and two vehicles about ten feet from the house that had been tampered with. Both cars had gas running down the side, one had a rag sticking in the fuel tank and the other car's gas cap had also been removed. (RR Vol. 3, p. 34)

State's Exhibit 2A through 2R, photographs of the house at 906 O'Quinn and its surroundings were admitted. (RR Vol. 3, p. 34-35) The Officer

3.

identified State's Exhibit 2E as the left side of the house and the two vehicles. (RR Vol. 3, p. 35-36) State's Exhibits 2H, 2I, 2J, and 2L, were the char marks on and around the window and ash below the window on the left side of the house, where the fire was located when he arrived. (RR Vol. 3, p. 36) State's Exhibit 2M shows the rag sticking out of the vehicle fuel filler hole that appears black in color and was wet to the touch. (RR Vol. 3, p. 36-37) State's Exhibits 2P and 2Q showed the back of the house with char marks on the window frame. (RR Vol. 3, p. 37)

On cross-examination, Officer Alexander stated that he was dispatched at about 4:45 a.m. (RR Vol. 3, p. 38) He could not recall his response time. He was not aware of whether anyone else was at the residence than Mr. Gilmore and did not recall talking to or seeing anyone else in the area. (RR Vol. 3, p. 39-40)

Officer Christopher Nash, a patrol officer of the LPD for nine years, responded to a fire at 1401 Keltys on November 13,2012.. (RR Vol. 3, p. 41-54). Officer Nash testified that he talked to a neighbor who told him the residence had been vacant for some time. He identified where the fire appeared to have started at the back of the residence and he observed a red lighter fluid can less than a foot underneath the building where flames were emitting. He hit and kicked the can to the street. (RR Vol. 3, p. 42-44)

State's Exhibits 4A through 4G, photographs of the structure at 1401 Keltys after the fire had been extinguished, were admitted. The Officer identified State's Exhibit 4D as the back of the house that was on fire. (RR Vol. 3, p. 46) He described where he found the lighter fluid can under the house and identified the can in State's Exhibit 4G. (RR Vol. 3, p. 47)

On cross examination, Officer Nash stated that he responded at about 5:20 a.m. (RR Vol. 3, p. 48) The witness stated that the lighter fluid can was about the

3.

size of a book. He testified that no one was present around the house. (RR Vol. 3, p. 50) Officer Nash stated that Officer Davis stopped and spoke with LaTonya Siggers who was riding a bicycle down the road. (RR Vol. 3, p. 51)

On redirect examination, Officer Nash identified the lighter fluid can collected at the residence. The can was contained in a paper bag that was placed in a box sealed with yellow evidence tap from the LPD's evidence property. (RR Vol. 3, p. 52) State's Exhibits 5 and 5A, the brown paper bag and lighter fluid can, were admitted. (RR Vol. 3, p. 53-54)

James "Baski" Davis, testified that he had lived in Lufkin all of his life and identified the defendant as Stanford Jones. (RR Vol. 3, p. 54-62) He remembered the fire, but he wasn't with and did not see the defendant. He got up around 4 a.m. and saw somebody, wearing a hood, riding a bike, coming off of Keltys behind the house. When he got off work that evening, the house was gone. He had told the Fire Marshal, Steve McCool, about seeing someone on a bicycle. (RR Vol. 3, p. 57-58)

The defense attorney objected to the witness testifying to what he had said on another occasion outside of court as being hearsay, unless being offered for a limited purpose. The court allowed the testimony for the limited purpose of impeaching the credibility of the witness. (RR Vol. 3, p. 58-59) Mr. Davis testified that he had spoken with the Fire Marshall in person and had viewed a photograph of more than one person. Mr. Davis stated that he did not recall telling the Fire Marshall who was on the bicycle. He did recall telling the Fire Marshall that the defendant was a classmate. The witness testified that he did not know why the Fire Marshall was talking to him and that he did not recall helping him with the investigation. (RR Vol. 3, p. 60-62)

Steve McCool, Fire Marshall for the City of Lufkin for six years,

4.

investigates fires in the city to determine the origin, cause, and circumstances resulting in a fire. (RR Vol. 3, p. 64-98) On November 13, 2012, he investigated a fire at 906 O'Quinn. (RR Vol. 3, p. 68) State's Exhibit 11, a certified copy of the Lufkin City Charter, was admitted. (RR Vol. 3, p. 69) Mr. McCool explained there were multiple points of origin of the fire outside the structure with no other reasonable competent source of ignition, which indicated that the fire was intentionally set. There was also a stick that was set up against the house that was on fire. (RR Vol. 3, p. 70) There was a similar stick located in the back of the property that appeared to have been removed from a pile and brought to the house. There was also a tire leaning on another window with debris on top that had caught on fire. He opined that fire could not have initiated in the two different locations. There were no electrical receptacles or other possible ignition source, so he determined that both fires were intentionally set. There was also a Jeep parked three to five feet from the left side of the house, that had the gas cap removed with a rag in the tank filler point. Since the cap was nearby, it appeared clear that the rag was not used as a gas cap and was "obviously" placed there. (RR Vol. 3, p. 71-72)

Mr. McCool viewed State's Exhibit 2I, a photograph of the left side of the house. He pointed out the fire damage from the stick. He explained that the stick had been removed prior to his arrival, but when he placed the stick back in its location, it matched the burn patterns. There appeared to be fire damage on the windowsill, and on the ground in front of the windowsill. (RR Vol. 3, p. 72) State's Exhibit 2G, was a photograph of the stick and 2B was a photograph of a cigarette lighter found in the yard, but he did not know whether the lighter was used to start the fire. (RR Vol. 3, p. 73-74)

State's Exhibit 13, a black rag, was removed from packaging. (RR Vol. 3, p. 77-78) Mr. McCool testified that State's Exhibit 13 is the rag he saw. (RR Vol. 3,

p. 79-80) Mr. McCool testified that he found some bicycle tracks at the 906 O'Quinn scene. He had seen a bicycle at defendant's and defendant's mother's residence. However, he was unable to match the tires of the bicycle and bicycle tracks. (RR Vol. 3, p. 81) The prosecutor asked Mr. McCool what Mr. Davis had told him. (RR Vol. 3, p. 82)

The defense attorney objected on the basis of hearsay and violation of the Sixth Amendment right to confrontation to admit that for the truth of the matter asserted. (RR Vol. 3, p. 82) The prosecutor argued that Mr. Davis was previously on the stand and was available to be confronted, that he was impeaching Mr. Davis with a prior inconsistent statement, and that he gave Mr. Davis an opportunity to admit or deny making this statement. (RR Vol. 3, p. 83)

During a bench conference, defense counsel stated that the prior statement by Mr. Davis was being offered for all purposes, not just impeachment. The prosecutor argued that he had given Mr. Davis the opportunity to admit making the statements and he denied it, so the prosecution was allowed to put in extraneous evidence that the statements were made under Rule 613A. The statement was verbal, recorded and transcribed. The court allowed the statement to be admitted for all purposes. The court noted defense counsel's objection due to hearsay, and overruled the objection. (RR Vol. 3, p. 83-86)

Mr. McCool stated that when he called Mr. Davis, Mr. Davis stated that he had some information. (RR Vol. 3, p. 87) Mr. McCool met Mr. Davis who said that he saw a man on a blue bicycle go behind the house that caught fire. Mr. Davis viewed a picture produced by Mr. McCool of the defendant taken at an LPD interview room and identified the person in the picture as the defendant. (RR Vol. 3, p. 88) The witness stated that Mr. Davis said that the defendant was the person riding the bicycle and that they had been classmates. Mr. Davis also told him what

6.

the bicyclist was wearing, his build, and told him to look at his Facebook page. (RR Vol. 3, p. 89) Defense counsel objected and asked that the jury be instructed to disregard the last statement. The Court instructed the jury to disregard the last question and response. Defense counsel moved for a mistrial which the court denied. (RR Vol. 3, p. 89)

Mr. McCool investigated another fire at 1000 Hosea Adolphus, in the city of Lufkin, Angelina County, Texas on the same day. (RR Vol. 3, p. 90) State's Exhibits 6A through 6E, photographs of the structure at 1000 Hosea Adolphus, were admitted. (RR Vol. 3, p. 90-91) Ruby Alexander lived at this location. State's Exhibit 6B showed the back of the structure and a pickup truck which was where the fire was located. The truck was situated about three to five feet from the structure. (RR Vol. 3, p. 92) State's Exhibit 6C shows blackening in the bed of the truck, and State's Exhibit 6E showed some material in the bed of the truck that was damaged by the fire. (RR Vol. 3, p. 93) Mr. McCool testified that he believed the fire was intentionally set, primarily because there was a reasonable or competent source of ignition in that area, and it occurred within two hours and within a block of two other cars that were, in his opinion, intentionally set. (RR Vol. 3, p. 93) In a conversation with the defendant, Mr. McCool stated that he had asked the defendant whether he was related to Marktez Alexander, and the defendant stated he was not but that they both fathered a child with the same woman. Mr. McCool testified that the defendant was very upset. (RR Vol. 3, p. 94)

On cross examination, Mr. McCool stated that he took photographs of the bicycle tire tracks at the 906 O'Quinn location. The tire tracks were in very fine powdered sand, so it didn't leave good tracks, and he could not say whether those tracks were from the bicycle located at the defendant's home. (RR Vol. 3, p. 95) Mr. McCool testified that Mr. Davis did not tell him he saw the defendant on the

7.

bicycle at first. Mr. McCool did not offer a photograph of anyone else for Mr. Davis to identify the bicyclist. (RR Vol. 3, p. 96) Mr. McCool stated that most of the people he had been dealing with had prior convictions, but was unaware that Mr. Davis had four felony convictions. (RR Vol. 3, p. 97)

At a bench conference, the court stated that he should have limited Mr. McCool's statements regarding his discussion with Mr. Davis to impeachment purposes, i.e., the inconsistent statements only and not for all purposes. Defense counsel stated that the court overruled his objection. The court stated that they can instruct the jury, and that it didn't believe that anything was asked other than for impeachment purposes that made any difference. (RR Vol. 3, p. 98)

Ozzie Jarman, Captain with the Lufkin Fire Department (LFD) has been with the LFD for nearly 14 years. (RR Vol. 3, p. 99-104) Mr. Jarman investigated a fire at 1401 Keltys on November 13, 2012. (RR Vol. 3, p. 100) In his opinion, the fire was set intentionally based on the fact that the structure was boarded up, the fire started on the outside of the structure on a windowsill, there was no gas or electricity, and there was no reasonable or competent ignition source other than an outside source, which could have been a match or lighter. Additionally, right under the point of origin there was a can of lighter fluid. Mr. Jarman interacted with the defendant several times, once pursuant to a court order to obtain a DNA sample. He did collect and preserve a DNA sample according to the step-by-step instructions and turned the sample in to the police department's evidence room. Mr. Jarman identified State's Exhibit 12 as the buccal swab contained in an envelope with his handwriting. (RR Vol. 3, p. 101-104)

Keith Lewing is the custodian of records and records supervisor for LPD. (RR Vol. 3, p. 105-110) Mr. Lewing discussed the collection and retention of in-

8.

car videos. The collection and initial storage of videos is automated. (RR Vol. 3, p. 106-109) State's Exhibit 8, a video of a fire that occurred on November 14, 2012 was admitted, a portion of which was published. (RR Vol. 3, p. 109-110)

Fire Marshal Steve McCool was recalled. (RR Vol. 3, p. 111-120) Mr. McCool had also investigated a fire on November 14, 2012 on Wilson Street. State's Exhibits 7A through 7Q, photographs of the 917 Wilson premises, were admitted. (RR Vol. 3, p. 112-113) Mr. McCool testified that he could not conclude whether this fire, the largest of the six fires, was intentional or not, but believed it was more likely than not that it was set intentionally. He did find it suspicious since it was unoccupied, had no electricity or gas, involved two other structures, and the time of day and proximity in time and location to the other fires. The witness testified that the house on the right caught fire first, burning to the ground, and he believed the radiant heat caused the adjacent house to catch fire, then a garage apartment behind the structure caught fire. State's Exhibit 7B showed the garage apartment and the remains of the first structure. It is Mr. McCool's opinion that the fire was initiated only in the first structure, and can't definitively say that fires were started in the other two structures. State's Exhibit 7K shows the first burned structure. (RR Vol. 3, p. 113-116)

On cross examination, Mr. McCool testified that the fire on Wilson Street was suspicious but was classified of undetermined origin, which could include an accident. The witness testified that he did not collect evidence to determine whether an accelerant was used. He could only say it was more likely than not that the fire was intentionally set, and could not be more definitive. There was a reference in some of the materials to a heavyset white female, wearing a black hooded shirt leaving in a green car that had not been located. No physical evidence

was taken from the Wilson location due to the extent of the damage which prevented a determination of whether the fire was set intentionally. (RR Vol. 3, p. 116-120)

Michelle Dupree testified she is a good friend with defendant. (RR Vol. 3, p. 120-126) On the morning of November 15, 2012, she recalled dropping the defendant off at his home around 7:15 to 7:30 a.m., and he went to the backyard, she believed to get in the house. She then went home to change clothes prior to going to class at Angelina College. She remembered it was around that time because she was five minutes late to class and was reprimanded for being late. She did not recall telling Mr. McCool it was around 6:00 or 6:15 a.m. (RR Vol. 3, p. 123-125)

The prosecution recalled Steve McCool. (RR Vol. 3, p. 127-131) Mr. McCool testified that he spoke with Michelle Dupree on several occasions. Mr. McCool stated it had been important to talk to her because the defendant said he was at her house. Defense counsel objected due to hearsay and the court ruled that any statements regarding what Ms. Dupree said were permissible for impeachment purposes only. Defense counsel requested that the jury be instructed on the meaning of impeachment. The court stated that impeachment is when you have a witness that makes one statement that is completely contrary to their prior statement, it is an inconsistent statement. The court is admitting the statement for that reason only, that the witness said one thing one day and another thing today. Defense counsel requested that the court instruct the jury that Mr. McCool's testimony regarding Mr. Davis' statements were limited to impeachment purposes as well. (RR Vol. 3, p. 127-130) Mr. McCool stated that Ms. Dupree had told him she returned home between 6:00 and 6:15 a.m. She remembered that because her alarm went off right after she arrived home. Mr. McCool regularly records his

10.

interviews and the recordings are transcribed. (RR Vol. 3, p. 130-131) Bobby Hobbs is the Battalion Chief for LFD, being with LFD for 29 years. (RR Vol. 3, p. 135-145) He responded to a fairly sizable fire at 514 Wilson. (RR Vol. 3, p. 135-136) Initially they normally send three stations, which is what happened for this fire. (RR Vol. 3, p. 137) Regarding this fire, the first thing that might be different or unusual was that station five arrived on scene first and reported that three structures were on fire and an unusual blue color flame from the front of one of the structures. The blue color flame signifies something unusual like a significant gas leak, an accelerant or other chemical. It appeared that one structure had been burning longer than the others and had started to collapse, and the other two structures were fully involved in flame. Since the structures appeared to be vacant, the goal was not to try to save the structures, but to contain the fire and make sure it did not spread. The witness testified that the fire was under control in about 25 minutes. He also recalled an extremely concerned family was out in the front yard across the street. (RR Vol. 3, p. 138-141) He said fire most often spreads either through direct contact or by radiant heat. (RR Vol. 3, p. 142)

On cross examination, Chief Hobbs stated that the blue flame could be caused by a gas leak or an accelerant. The LFD did contact the gas company and it was Chief Hobbs understanding that there were no gas lines in that particular area. Regardless, it still could have been a gas leak, but in his opinion that is unlikely. (RR Vol. 3, p. 143) Chief Hobbs did not determine what caused the fire. He relies on an investigator when the cause is not obvious. There are a lot of reasons that unintentional fires occur. (RR Vol. 3, p. 144)

Mr. McCool was recalled. (RR Vol. 3, p. 145-159) On November 15, 2012, two fires occurred with multiple ignition points. On that day, Mr. McCool had an opportunity to investigate a fire at Lanzy's Club, also called Owens' Club located

11.

at 813 Keltys where the defendant had an altercation prior to these fires. (RR Vol. 3, p. 146) State's Exhibits 9A through 9N, photographs of 813 Keltys and the surrounding areas, were admitted. (RR Vol. 3, p. 147-148) The first story of the structure is the club and the second story is the residence of Ms. Owens, a relative of Lanzy Owens, the owner. (RR Vol. 3, p. 149) Mr. McCool testified that there were at least three sources of ignition. State's Exhibits 9C and 9B show fire damage on a white metal door and a piece of brown paper, the ignition source, with fire damage that had been wedged in the door. (RR Vol. 3, p. 150-151) State's Exhibit 9F shows stairs to the upstairs residence, being the only access to the residence and a door at the base of the stairs that is the back entrance to the club. (RR Vol. 3, p. 151) State's Exhibits 9G, 9H, 9J and 9I were photographs of the back door to the club and show fire and heat damage to the door, and the newspapers which were the ignition source. (RR Vol. 3, p. 152) State's Exhibit 9L showed the building's floor mat hanging off the roof that had fire damage. (RR Vol. 3, p. 153) In his opinion, three sources of fire would point to an intentionally set fire. (RR Vol. 3, p. 154) With most of the fires that he investigated, the materials used in ignition were readily available at the scene such as the floor mat, paper, and the stick. (RR Vol. 3, p. 155)

On cross examination, regarding 813 Keltys, Owens Club, Mr. McCool stated the remainder of the paper that was stuffed into the door was submitted to evidence, but the newspaper was wet, so it was not submitted for fingerprint analysis. (RR Vol. 3, p. 156-157)

Ozzie Jarmen was recalled. (RR Vol. 3, p. 159-165) Mr. Jarmen also investigated a fire at 714 Cottonbelt on November 15, 2012. (RR Vol. 3, p. 160) State's Exhibits 10A through 10H, photographs of the structure and surrounding areas of the 714 Cottonbelt fire, were admitted. (RR Vol. 3, p. 160-161) State's

12.

Exhibit 10D shows the attached carport and laundry room, where the fire was located. State's Exhibits 10E and 10G show one piece of plywood that was left in the laundry room and the remnants of pine straw and cardboard used to ignite the fire. State's Exhibit 10C shows another piece of plywood that was removed by a LPD officer. The LPD officer was alerted to the fire stopped to investigate and removed that piece of plywood to the driveway to prevent the fire from spreading. The house was vacant. Mr. Jarmen's opinion is that this fire was intentionally set based on the facts that the house was abandoned, there was no electricity or gas, there was no other competent and reasonable ignition source in that area, and the pine straw and cardboard appeared to be positioned in a way to ignite the plywood. The photographs show that some of the pine straw and cardboard had been charred. (RR Vol. 3, p. 161-165)

Laura Owens Black, Lanzy Owens' sister, was called as the next witness. (RR Vol. 4, p. 7-11) She currently lives in the second story, above Owens Club at 817 Keltys. (RR Vol. 4, p. 8) She was asleep at the time of the fire, smelled something burning, thought it was the burn pile, but then looked out the kitchen window and saw the back door of the club was on fire. She then ran down the stairs and next door where her brother lived, and called the fire department. The witness testified that her brother started putting out the fire with a water hose and was almost extinguished by the time the LFD got there. Ms. Black testified that the stairs are the only access to the second story apartment. (RR Vol. 4, p. 10-11)

Lanzy Owens lived at 815 Keltys for 62 years. (RR Vol. 4, p. 11-18) He has operated the club since 1987, and owns the whole block. (RR Vol. 4, p; 12) He lives in the house next door. The fire of November 15, 2012 started between 5:00 a.m. and 6:00 a.m. He recalled his sister, Ms. Black screaming. He went outside and the club door was on fire. His sister was standing at the top of the stairs, so he

13.

grabbed the water hose, sprayed the door, unlocked it and opened it. The whole building was filled with smoke. Mr. Owens testified that he extinguished the fire. Only the door was on fire. The flames were reaching the roof, so he sprayed the roof first and then the door. Mr. Owens viewed State's Exhibits 9A, 9D, and 9F and described the structures and visible fire damage. State's Exhibit 9M showed that carpet that was thrown on the roof, and the witness opined that "he could not reach it anymore, so that is why he went to the back." The day before the fire, the carpet and paper were not there. He did not see anybody set the fires. (RR Vol. 4, p. 13-17)

Officer Brandon White had worked for the LPD for five and a half years. (RR Vol. 4, p. 18-23) On the morning of November 15, 2012, he was travelling down Cottonbelt and observed smoke emitting from underneath a carport. He discovered an active fire in the washroom. A piece of plywood that was on fire was leaned up against the washroom wall. Officer White testified that he removed the wood from the room to the yard. The fire department responded and the put the fire out. The witness testified that the fire appeared to have just been set. The fire was small and did not "get on the walls that much." Officer White viewed and described State's Exhibits 10A, the residence, 10D, the carport, and 10 C and 10E, the board he removed. (RR Vol. 4, p. 19-22)

Officer Jeremy Charvoz is a patrol officer with the LPD. (RR Vol. 4, p. 23-28) At the time of the fires, he was a crime scene technician, collecting and preserving evidence, photographing the scene, and storing and securing evidence. (RR Vol. 4, p. 24) He responded to 906 O'Quinn on November 13, 2012. Officer Charvoz identified the vehicle and the black rag hanging out of the gas tank in State's Exhibits 2L and 2M. (RR Vol. 4, p. 25) The black rag was collected for

14.

evidence, placed in a brown sack, labeled, secured at the scene and transported to the LPD property room. Officer Charvoz identified State's Exhibit 13 as the black rag that was collected at the scene of the fire. (RR Vol. 4, p. 26)

On cross examination, Officer Charvoz stated that other items were collected for evidence such as photographs, a black gas cap and a cigarette lighter. He was unaware of whether any testing was performed on these items after being collected. (RR Vol. 4, p. 27-28)

Stephen Abbott is the Sergeant of Criminal Investigations for the LPD. (RR Vol. 4, p. 28-36) He was called out at about 7:15 to 7:30 a.m. on November 15, 2012, to respond to a possible arson event at Owens' Club on Keltys. Upon arrival, he was directed to the front door where it appeared that someone had attempted to set it on fire. (RR Vol. 4, p. 29) He believed there were two fires that morning, one on O'Quinn and one on Keltys. These locations are about seven or eight blocks apart. The LPD walked the railroad track trail that runs from O'Quinn to the backside of Owens Club, because that was the most logical place for someone not to be seen. Sergeant Abbott identified the railroad tracks on State's Exhibit 1. The witness testified that the weather was almost freezing with a hard frost on the ground. He identified some phlegm that appeared fresh, and directed that a swab be collected. The swab was entered into evidence and transported to DPS for analysis. (RR Vol. 4, p. 29-32)

On cross examination, Sergeant Abbott corrected himself that the trail ran between Owens' Club and Cottonbelt, not O'Quinn. The witness testified that people have access to the trail along the train tracks. He opined the trail was an area which was used by people who wanted to avoid detection, but not all people who use the trail want to avoid detection. The Sergeant testified that the distance

15.

from Owens' Club to Cottonbelt, is between one-half mile to one mile. (RR Vol. 4, p. 34-36)

Christy Pate works for the LPD in the property and evidence section and crime scene technician. (RR Vol. 4, p. 37-46) Her duties include collecting evidence, storing evidence, sending evidence to labs and bringing it to court. Regarding this case, she did not collect any evidence, it had already been collected. On July 10, 2013, three pieces of evidence were sent by certified mail to the DPS lab in Houston, being a buccal swab from the defendant, some swabs of saliva, and a black cloth. A buccal swab is like a Q-tip that you swab a person's mouth to collect DNA. The items were properly packaged and stored. Ms. Pate discussed chain of custody procedures. The DPS lab retains the evidence until LPD picks it up in person or via mail. These particular items were picked up by her partner, Christi Esteves. (RR Vol. 4, p. 38-41)

On cross examination, Ms. Pate confirmed that one of the reasons to collect evidence is for various testing like DNA and fingerprints. (RR Vol. 4, p. 41) Other items were also collected as evidence, one of which may have been a cigarette lighter, but she wasn't sure because she did not have her evidence sheets available. She believed Officer Charvoz collected the cigarette lighter and had it tested for fingerprints. (RR Vol. 4, p. 42) Also, according to notes on an evidence sheet, Ms. Pate testified that a lighter fluid can was sent on November 15, 2012 to Southwestern Forensics in Dallas. Ms. Pate explained that the log sheet she was viewing contained notes for her purposes and there is more paperwork that goes with different items. Defense counsel noted that the log sheet did not mention the cigarette lighter. Ms. Pate explained that the lighter is on another log sheet since several case numbers were associated with this case. Defense counsel requested to view all of the logs. (RR Vol. 4, p. 43-44) Ms. Pate admitted that she wasn't sure

16.

whether latent fingerprints were taken from any of the items on her log sheet. She stated that either Officer Charvoz or Debra Walsh may know whether latent fingerprints were obtained from these items. (RR Vol. 4, p. 45)

Christi Esteves also works for the LPD as a property evidence technician and crime scene technician. (RR Vol. 4, p. 46-49) Ms. Esteves has worked as a property evidence technician for the past year and a half. (RR Vol. 4, p. 46) She was not involved in the logging, storage, or submitting to a lab of the evidence in this case. She did pick up and transport the three items, being the black rag, the buccal swab and two swabs from the railroad tracks, from the DPS lab in Houston to the LPD facility. Ms. Esteves testified about the chain of custody and storage of the three items. (RR Vol. 4, p. 47-48)

Brenda Jones Runnels is the defendant's mother. (RR Vol. 4, p. 50-71) Ms. Runnels testified that she had been at the defendant's house for a while during the day and left around 8:00 p.m. At midnight, she received a call to come check on the defendant. (RR Vol. 4, p. 53) She saw him walking down the street on Keltys, acting strangely and he was wearing jeans and a button down shirt. His girlfriend was with him and some other people. Ms. Runnels stated that he said he had hit a wall and thought he broke his fingers. She and another son, Carl Jr., drove him to the hospital. (RR Vol. 4, p. 54-55) Evelyn Hamilton was his girlfriend at the time. He was in the hospital for three or four days. The witness testified that the hospital never said what was wrong with the defendant. (RR Vol. 4, p. 55-57) State's Exhibit 24A through 24I, photographs of the defendant were admitted. (RR Vol. 4, p. 58-60) The witness was shown State's Exhibit 24D, a photograph of the defendant in the hospital. She wasn't sure who took the picture, but thought it may have been little Carl. Ms. Runnels testified that she did not know until later that this photograph was posted on the defendant's Facebook page and didn't know

17.

when it had been posted. (RR Vol. 4, p. 61-63) Ms. Runnels stated that, while in the hospital, the defendant talked on his phone some, but that she did not see him using Facebook. (RR Vol. 4, p. 65) She stated that if there were some behavior that she didn't like, she would address that face-to-face, not through Facebook. (RR Vol. 4, p. 66)

During a bench conference, defense counsel objected to testimony regarding the content of the Facebook postings since there was an issue about authentication that the Court had not ruled on as part of his motion in limine. The prosecution stated that he was just asking the witness what upset her about the defendant's Facebook page and that the defendant's family members routinely conversed with him online. The prosecution stated that he had two witnesses claiming that the defendant had his phone while in the hospital and that he posted things to Facebook while he was in the house and the only posts when he was in the hospital "are these bad ones." The Court stated that the prosecution needed to establish the predicate of the face book posting and then defense counsel can make his objection. (RR Vol. 4, p. 66-67)

Ms. Runnels testified that the defendant was born in Lufkin. She stated that he had lived out of state, had worked for a food distribution company named William George, and called himself "jboyheartofthanorth." (RR Vol. 4, p. 67-68)

On cross examination, Ms. Runnels testified that she had three Facebook pages, and that someone had posted a picture to her page before. Often she did not log out of Facebook. The witness stated that she could go onto her son's Facebook page and type, email or post anything she wanted without his password. (RR Vol. 4, p. 68-70)

Jenna Dunton testified as an expert in DNA analysis. (RR Vol. 4, p. 73-96) On voir dire examination by defense counsel, Ms. Dunton testified that it is not

possible to determine how long DNA has been present on an item like the black cloth or the swabs from the railroad tracks. When referring to DNA evidence, a mixture means that there is more than one contributor or person to a DNA profile. Ms. Dunton stated that she was submitted only one known sample in this case for comparison. (RR Vol. 4, p. 74-75)

Jenna Dunton is a forensic scientist at the Texas Department of Public Safety Crime Laboratory in Houston (RR Vol. 4, p. 76-78) Ms. Dunton then explained how DNA samples were extracted from evidence samples and summarized the analytical process.(RR Vol. 4, p. 79-80) State's Exhibit 15, a forensic biology laboratory report, is the first report that is issued in a DNA case where an analyst screens the evidence and decides what can be forwarded on for DNA analysis, was admitted. (RR Vol. 4, p. 82-84) State's Exhibit 15 indicated that a black cloth, swabs from the railroad track, and buccal swabs were received by the lab from LPD. The witness described the storage and tracking of samples once received by the lab. (RR Vol. 4, p. 84-85) With regards to the sputum sample found on the railroad tracks, Ms. Dunton testified that the defendant could not be excluded as a contributor of the profile, and to a reasonable degree of scientific certainty, the defendant is the source. (RR Vol. 4, p. 86-88) Ms. Dunton testified that the DNA profile from the black rag/cloth was consistent with a mixture and that the defendant cannot be excluded as a contributor to the profile, but there was an unknown portion of this profile that could potentially be compared to at least one other contributor. (RR Vol. 4, p. 88) State's Exhibit 16, the DNA laboratory report that she prepared and substantially sets forth these findings, was admitted. (RR Vol. 4, p. 89-90) Ms. Dunton testified that she was unaware of any scientific studies, findings or conclusions showing that the presence of a petroleum

19.

accelerant would impair the validity of her analysis. She stated that the presence of such an accelerant may make it more difficult to obtain a profile but would not negate any profile that was obtained. (RR Vol. 4, p. 90)

On cross examination, Ms. Dunton testified that it was not possible for her to determine how long DNA had been on a particular object. The witness stated that many variables were involved in transferring DNA to the black cloth, including how long he touched it. She stated that certain people shed DNA more than others. (RR Vol. 4, p. 92) The witness testified that the cloth had DNA from at least two people, but could have been more than two people. She was not asked to compare the DNA profile to anyone other than the defendant. Ms. Dunton stated that it is possible to have tested a cigarette lighter, a gas can, a cigarette butt, plywood, or newspaper for DNA. If an item had been exposed to fire it may have been more difficult to obtain DNA from the item, but it is still possible. (RR Vol. 4, p. 93-96)

During a bench conference, defense counsel stated that he had reviewed the redacted booking sheet. (RR Vol. 97-98) Defense counsel informed the court that he was going to object to admittance of the booking sheet due to being more prejudicial than probative and should be excluded under Rule 403. The prosecution stated that as soon as the defendant was arrested the fires stopped and it isn't prejudicial because they were excising out information regarding the charge. The Court ruled that they would allow the exhibit. (RR Vol. 4, p. 98)

Chad Hooper is the jail administrator for Angelina County. (RR Vol. 4, p. 99-103) His duties include the general running of the facility, including the booking process, the release process, property, discipline, grievances, inmate issues, employees and staff. (RR Vol. 4, p. 99) A booking sheet contains all of the information on the arrestee, including name, sex, race, his personal property, his charges, and marital status. They prepare a booking sheet for everyone that is

arrested. (RR Vol. 4, p. 100) State's Exhibit 17, a booking sheet for the defendant dated November 15, 2012, was offered. Defense counsel objected citing his previous objection. The Court overruled defense counsel's objection and admitted State's Exhibit 17. The booking sheet noted the defendant had three lighters in his possession upon arrest. (RR Vol. 4, p. 101-102)

Brenda Jones Runnels was recalled. (RR Vol. 4, p. 103-106) The witness viewed a printout of the defendant's Facebook page that included a picture taken at the hospital. (RR Vol. 4, p. 105)

LaTonya Siggers knows the defendant. (RR Vol. 5, p. 8-14) The witness recalled that she was with the defendant early one morning of the fires, while it was still dark. Defendant left her to go over to O'Quinn Street for about five to ten minutes. He did not specify what he was doing. (RR Vol. 5, p. 9) She believed he was on a bicycle. She wasn't sure if that was the same day that the 906 O'Quinn house almost caught fire, but the Keltys fire was later that day. Ms. Siggers testified that the defendant was at his mother's house at the time of the Keltys fire. She saw fire trucks in the daytime. (RR Vol. 5, p. 10) When they saw the fire trucks, the defendant asked her to ride down there to see what was going on and let him know. The defendant asked her a lot of questions, but they were standing together and the defendant did not go see the fire. After she went to look at the fire trucks, she told the defendant that the house on Carver and Keltys was on fire and they left. He went to his mother's house which is on the other end of Keltys. (RR Vol. 5, p. 11) She had some criminal history, being a state jail felony burglary in 2000. (RR Vol. 5, p. 12)

On cross examination, Ms. Siggers testified that on the morning of the Keltys fire, she was riding a bicycle, but when the police saw her she was not

21.

riding a bicycle, that one of the police officers knew her, so she thought he assumed that she was the one that started the fire. She stated that she and a couple of more people walked up to the fire. (RR Vol. 5, p. 13)

On redirect examination, Ms. Siggers stated that the bicycle she was riding was the defendant's mother's bicycle and the same one the defendant used to ride down to O'Quinn. (RR Vol. 5, p. 13-14)

Evelyn Hamilton was the defendant's girlfriend for five years. (RR Vol. 5, p. 14-20) Ms. Hamilton testified that she and defendant had been at Lanzy's bar immediately prior to those fires. (RR Vol. 5, p. 15) The defendant met her at the bar and appeared to be acting normally. The witness stated that after two drinks he started acting "crazy", not like himself. She left the club, but received a phone call asking for her to pick up the defendant. When she returned to the club, she did not see him at first, and when she did find him he was in an abandoned house, unclothed, except his boxers, and had hit a wall, breaking his finger. Ms. Hamilton testified that the defendant then started running down the street, so she called the defendant's brother. The defendant's brother, mother and herself took the defendant to the hospital. She stayed at the hospital until she was told that "somebody had put something in his drink and they like to have given him an overdose." Then she left and returned the next day. She did not see the defendant post anything to Facebook with his phone while he was in the hospital. Ms. Hamilton testified that she looked at her Facebook page after she returned home and saw posts from the defendant. She was unaware of any photographs taken of the defendant at the hospital. (RR Vol. 5, p. 16-18) Ms. Hamilton viewed State's Exhibit 24D, being a picture of the defendant, apparently taken at the hospital, but she did not know who had taken the picture. She had heard of the defendant's user

22.

name "jboyheartofthanorth", but did not know whether he used it as his e-mail address. She stated that she had been convicted of tampering with evidence the previous year. (RR Vol. 5, p. 19-20)

Steve McCool was recalled. (RR Vol. 5, p. 24-61) Mr. McCool testified that he was the lead investigator on this case, and that he spoke with many people in the neighborhood, including the defendant. When he spoke with the defendant, he wasn't considered to be a suspect and appeared to be "in possession of his faculties." (RR Vol. 5, p. 24) Mr. McCool stated that he was not able to verify any alibi that the defendant had given. (RR Vol. 5, p. 25) Almost all of the interviews with the people in the neighborhood were recorded and then transcribed. In his experience, he had not ever heard of six accidental fires in a 48 hour period in one neighborhood. After the defendant was arrested, there were no additional fires, and then several months passed before an accidental fire occurred in that area. (RR Vol. 5, p. 26) Mr. McCool viewed State's Exhibits 19A through 19F, photographs of the defendant at the time of his arrest and interview at the LPD, were offered. State's Exhibits 19B through 19E were admitted. State's Exhibits 19A and 19F were excluded by the Court after defense counsel objection that those photographs of the defendant in handcuffs were prejudicial and the prejudice would outweigh the probative value since they unfairly suggested guilt. (RR Vol. 5, p. 27-28) Mr. McCool had observed a blue bicycle at the defendant's residence once when he was speaking with the defendant between fires. Mr. McCool observed State's Exhibit 1 and stated that the six stickers on the exhibit accurately represented the locations of the fires. (RR Vol. 5, p. 29) State's Exhibit 1, a map of the fire locations, was admitted. (RR Vol. 5, p. 30)

Mr. McCool testified that attempts were made to see if any fingerprints were found on the cigarette lighter, two gas caps found at 906 O'Quinn, a piece of paper

23.

wedged in the door at 813 Keltys, and a piece of paper at 714 Cottonbelt, but none were found. The lighter fluid can found at 1401 Keltys was tested for DNA testing with no result. Mr. McCool explained that there are different types of lighter fluid, such as charcoal lighter fluid and cigarette lighter fluid. Charcoal lighter fluid is designed specifically to absorb into the wood or the charcoal and assist in igniting the material and cigarette lighter fluid evaporates quickly and would not be as effective at catching a piece of wood on fire. (RR Vol. 5, p. 32-35) State's Exhibit 22, hospital records for the defendant immediately prior to the fires, was admitted. Mr. McCool testified that he considered suspects other than the defendant, including Ms. Siggers. (RR Vol. 5, p. 36-37) Mr. McCool suspected Ms. Siggers may have been present at the Owens' Club and Cottonbelt fires. He considered her alibis for the remaining fires were sufficient and was confident that she had no involvement. The witness stated that if he recalled correctly, the defendant also said that she was at his house during the time of the Owens' Club and Cottonbelt fires. (RR Vol. 5, p. 38) Mr. McCool viewed State's Exhibit 25, the defendant's Facebook page that he printed. (RR Vol. 5, p. 39) State's Exhibit 23, Yahoo records for e-mail address jboyofthanorth@yahoo.com, were admitted. (RR Vol. 5, p. 41) Mr. McCool testified that this e-mail address is the same that is linked to the defendant's Facebook page. (RR Vol. 5, p. 42) Mr. McCool viewed State's Exhibits 24A through 24I, pictures off of the defendant's Facebook page. Some of the photographs appear to be selfies. At least one of the photographs was taken immediately preceding the days the fires occurred. Prosecution offered State's Exhibit 25. (RR Vol. 5, p. 43)

During bench conference, defense counsel objected that State's Exhibit had not been satisfactorily authenticated under Rule 901. Case law has stated that it is not enough that evidence or testimony shows that a printout "comes from a

24.

Facebook page or social media site registered to someone or is under their name. There has to be other circumstances. The case the Court's heard is that other people can have access to a Facebook page. His mother even testified that someone has gone under her Facebook page and posted some other things. To satisfy the predicate, I believe you would have to have some evidence about it being exclusive access to the computer or from the site that was used to post the information. In that absence, Rule 901 is unsatisfied." The Court ruled that proper predicate had been established, overruled defense counsel's objection, and admitted State's Exhibit 25. (RR Vol. 5, p. 44) Defense counsel requested a running objection to all references to the material which the Court noted. State's Exhibits 25A through 25C, presumably printouts of defendant's Facebook page, also being referred to as 25, were admitted and objection noted. (RR Vol. 5, p. 45)

Mr. McCool viewed State's Exhibits 25A through 25C, stated that these were printouts of defendant's Facebook page, and dated November 11, 2012, the date the defendant was in the hospital. Mr. McCool read from State's Exhibit 25A, a posting under defendant's name being "No tell your brother I'm ready to put a match to Lufkin tx and watch this muthafucka burn down su wuu biz." State's Exhibit 25B included another posting on that same date saying "Enjoy a peaceful night get plenty of sleep because after tonight some of you will see heaven the rest of you go burn ya go burn slow." State's Exhibit 25C included a third posting on the same date by defendant saying "I'm alive and all you muthafucka who want me dead you go die before me one by one lord forgive me for my sins." Mr. McCool stated that he interviewed at least 35 people, and multiple people told him to look at the defendant's Facebook page. Defense counsel objected, and the Court sustained. Defense counsel asked the Court to instruct the jury to disregard. The

25.

Court instructed the jury to disregard the questions and answers regarding interviewees who told Mr. McCool to look at defendant's Facebook page. Defense counsel moved for a mistrial, which the Court denied. (RR Vol. 5, p. 46-48)

On cross examination, Mr. McCool testified that the cigarette lighter that was collected as evidence related to the O'Quinn Street fire was not tested for DNA analysis. The witness stated that the lighter fluid can was not tested for fingerprints because they did not want to compromise any potential DNA on the can. The floor mat collected at Owens' Club found on the roof that was on fire was not submitted for DNA analysis. A piece of paper sack that had been stuffed in the doorway and set on fire at Owens' Club was not submitted for DNA analysis, and there was not enough material to submit for fingerprinting. The tire that was set up against the house at 906 O'Quinn was not submitted for DNA analysis. Mr. McCool testified that neither of the gas caps from that location were submitted for DNA analysis, because he felt that the caps would not effectively collect enough DNA to justify sending them to a lab. Mr. McCool stated that he actually determines the degree of significance and probability that is will actually contain evidence, not the lab. (RR Vol. 5, p. 49-54) Mr. McCool stated that he interviewed the defendant at his residence at 10:32 a.m. on November 14, 2012, after the first three fires. At the time of the interview, he was dressed in his official uniform. (RR Vol. 5, p. 54-56) The witness testified that the distance between Lanzy's Bar and Cottonbelt, based on the map, is about five blocks. He did not walk the distance. Lanzy's fire occurred at approximately 6:31 a.m., the Cottonbelt fire was discovered at approximately 6:50 a.m., and the 813 Keltys fire was discovered at approximately 6:30 a.m. (RR Vol. 5, p. 57-58) Regarding Ms. Siggers, the witness checked out where she was during the fires primarily through statements made by people. Mr. McCool stated that he didn't really recall who he spoke with regarding

26.

Ms. Siggers nor whether any of them testified in court. (RR Vol. 5, p. 59-60) Mr. McCool testified that he did not obtain a DNA sample from Ms. Siggers, although the DNA profile showed more than one person. (RR Vol. 5, p. 61) The State and the defense rested. (RR Vol. 5, p. 61-62)

At bench conference, defense counsel informed the court that he planned to make a motion for a directed verdict regarding count four, the Wilson Street fire. The basis for his motion was that the State did not prove that the fire was set intentionally. Fire Marshall McCool testified that the fire was suspicious, and it was more likely than not intentionally set. Additionally, there was no physical evidence of any kind connecting the defendant to this fire. The prosecution responded that Mr. McCool testified that this fire was sandwiched between other fires that were intentionally set and that the odds of having all of these accidental fires in a short time span was extremely unlikely. Additionally, the modus operandi was similar in time. Mr. McCool had testified that the reason this fire was suspicious was simply because it was sandwiched between the others. The Court advised the prosecution to exclude count four. (RR Vol. 5, p. 63-65) After discussion, the Court stated that it would inform the jury that count four would not be presented to them and it is not their concern as to the reason. Defense counsel agreed to said instruction. (RR Vol. 5, p. 67)

During the charge conference, defense counsel objected to the entire charge being submitted to the jury based on insufficiency of the evidence. The Court overruled the objection except for count four. (RR Vol. 5, p. 70)

The court read the charge to the jury. (RR Vol. 5, p. 72-84) During the prosecution's closing arguments, the prosecution stated that Mr. Baski Davis had testified that he saw someone riding a bicycle but did not know who it was. Then Mr. McCool testified that Mr. Davis had told him that it was Stanford Jones.

27.

Defense counsel objected to the characterization as the evidence was admitted for impeachment purposes only. The Court reiterated that the evidence was admitted for impeachment purposes only. The prosecution responded that when Mr. Davis stated that the person was not the defendant, he was not being credible. (RR Vol. 5, p. 92-93) After closing arguments, the jury deliberated. (RR Vol. 5, p. 114-118) The jury returned a verdict of guilty on count one, arson of a habitation, of guilty on count two, arson of a building, of not guilty on count three, arson of a vehicle, of guilty on count five, arson of a habitation, and of not guilty on count six, arson of a building. (RR Vol. 5, p. 119) The court recessed. (RR Vol. 5, p. 122)

A sentencing hearing was held on May 14, 2015. (Vol. 6, p. 4) The prosecution stated that he would not call any witnesses and requested that the court rely on the presentence investigation report. (RR Vol. 6, p. 4) Defense counsel called Brenda Runnels, the defendant's mother. (RR Vol. 6, p. 5-11) Ms. Runnels testified that she was involved in obtaining nearly 80 letters in support of the defendant from people in the community that were willing and able to provide them. The witness stated that the defendant has a big support system in the community and will support him no matter what happens. (RR Vol. 6, p. 6-7) Ms. Runnels testified that the defendant had changed within the last two years and she believed he "got his head on straight." (RR Vol. 6, p. 8) She reiterated she had never seen her son in the condition he was in when he went to the hospital. (RR Vol. 6, p. 9)

On bench examination, the Court questioned Bonita Barlow, the probation officer that prepared the presentence investigation report. (RR Vol. 6, p. 11-13) Ms. Barlow testified that the defendant had told her he had made a career out of selling drugs until sentenced to a TDJC facility in 2012. He had some work history at a variety of places, and that the variability was partially due to being

28.

incarcerated. The witness testified that he had been incarcerated prior to trial due to a revocation of probation. (RR Vol. 6, p. 11-12) Ms. Barlow stated that the defendant had gone to treatment and that he had not displayed any remorse for the victims in this case. (RR Vol. 6, p. 13)

The trial court sentenced appellant to confinement in the Texas Department of Criminal Justice System Institutional Division for a period of 20 years. (RR Vol. 6, p. 16)

## SUMMARY OF THE ARGUMENT

The evidence is legally insufficient to prove counts 1, 2 and 5 of arson as alleged in the indictment. The appellant argues the jury's verdict of guilt was improper and the judgment should be reversed and the appellant acquitted. There were no eyewitnesses to any of the arsons and the only DNA among several possibilities was a cloth/rag not shown to be used in the crimes to contain appellants and one other parties DNA. Secondly, sputum found some distance from the fires was found to have the appellant's DNA but not at the scene of any crime. These two items were not shown to be connected to the offenses. Additionally, improper hearsay was allowed in respect to impermissible impeachment evidence regarding two witnesses. Lastly, the trial court allowed unauthenticated Face book evidence which cumulatively resulted in conviction of the appellant on unreliable

29.

evidence. The inconsistency and conflict of testimony fails to provide sufficient testimony which is legally sufficient for the basis of the trial court's finding of guilt.

## **ARGUMENT**

## **Issue 1**

## **The evidence is legally insufficient to prove the three offenses of Arson as alleged in count I, II and V in the indictment.**

Appellant argues that the evidence is legally insufficient to support the finding of guilt for three counts of the arson as the convictions are not supported by the evidence. The State's indictment is pursuant to

Tex. Penal Code Ann. § 28.02 (West 2011) Sec. 28.02. ARSON. (a) A person commits an offense if the person starts a fire, regardless of whether the fire continues after ignition, or causes an explosion with intent to destroy or damage:
>            (1) any vegetation, fence, or structure on open-space land;
> or
>            (2) any building, habitation, or vehicle:
>                 (A) knowing that it is within the limits of an incorporated city or town;
>       (a-2) A person commits an offense if the person intentionally starts a fire or causes an explosion and in so doing:
>            (1) recklessly damages or destroys a building belonging to another; or
>       (d) An offense under Subsection (a) is a felony of the second degree, except that the offense is a felony of the first degree if it is shown on the trial of the offense that:
>            ((2) the property intended to be damaged or destroyed by the actor was a habitation or a place of assembly or worship.

30.

Appellant is aware that in a legal sufficiency review, this Honorable Court will examine the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Appellant recognizes the jury is the sole judge of the credibility and weight to be attached to the testimony of witnesses. Thomas v. State, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing Jackson, 443 U.S. at 319). Appellant understands this court will give full deference to the jury's responsibility to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Further, appellant understands if the record contains conflicting inferences, this court will presume the jury resolved such conflicts in favor of the verdict and defer to that resolution. Thomas, 444 S.W.3d at 8.

> "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Hooper, 214 S.W.3d at 13.

Appellant argues that the evidence in the instant matter is insufficient because "the record contains a mere modicum of evidence probative of an element of the offense." Gonzalez v. State, 337 S.W.3d 473, 479 (Tex. App.-Houston [1

Dist.] 2011) Appellant recognizes this Honorable Court will give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, Appellant asks this Court to: "to ensure that the evidence presented actually supports a conclusion that the defendant committed; the criminal offenses of arson in counts I, II and V and of which he is accused. Williams, supra.

The sufficiency of the evidence is measured by the elements of the offense as defined in a hypothetically correct jury charge, which is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). If an appellate court finds the evidence insufficient under this standard, it must reverse the judgment and enter an order of acquittal. Gonzalez, 337 S.W.3d at 479.supra.

The State failed to prove as reflected in the indictment regarding counts 1, 2, 5 that the appellant committed the offenses of arson. (RR Vol. 3) On appeal, Appellant argues there is legally insufficient evidence he committed arson as required to convict him for the offenses of arson.

32.

In the instant matter there were two items of physical evidence linked to the appellant. The state introduced a rag/cloth with DNA and sputum with DNA over objection and additionally the state offered impeachment testimony and face book postings. Each of these will be considered. This evidence is circumstantial as appellant argues the state had no direct evidence. The issue here is whether the circumstantial evidence is "as probative and sufficient in establishing the guilt of the appellant. Appellant is aware circumstantial evidence alone can be sufficient to establish guilt." Hooper v. State, supra.

Officer Alexander did not see appellant in the area during the course of his investigation in regard to the 907 O'Quinn fire. (RR Vol. 3 p. 39-40) Officer Nash in regard to 1401 Keltys discovered the house had been vacant some time. (RR Vol. 3 p. 40) The Officer observed Ms. Siggers and not the appellant on a bicycle, as she rode over on her bike and left the area fast. RR Vol. 3 p.51) James Davis could not identify a person in the area on November 13, 2012.( RR Vol. 3 p. 54-58) He denied suggesting it was the appellant to fire chief McCool or to confirm he said he saw a man riding a bike wearing a hoodie. (RR Vol. 3 p. 54-58) He did not recall identifying appellant as being a former classmate or trying to help officer McCool. (RR Vol. 3 p. 60) Officer McCool found a rag at 906 O' Quinn with appellants and another person's DNA. (RR Vol. 3 p. 77-80) A bicycle found at appellant's mother's house could not be matched to bicycle tracks at the scene. (RR Vol. 3 p.95-96) Mr. McCool testified that he found some bicycle tracks at the 906 O'Quinn scene. He had seen a bicycle at defendant's and defendant's mother's residence. However, he was unable to match the tires of the bicycle and bicycle tracks. (RR Vol. 3, p. 96) Officer Nash stated that Officer Davis stopped and

33.

spoke with LaTonya Siggers who was riding a bicycle down the road. (RR Vol. 3, p. 51)

Michelle Dupree testified she is a good friend with defendant. (RR Vol. 3, p. 120-126) On the morning of November 15, 2012, she recalled dropping the defendant off at his home around 7:15 to 7:30 a.m., and he went to the backyard, she believed to get in the house. She then went home to change clothes prior to going to class at Angelina College. She remembered it was around that time because she was five minutes late to class and was reprimanded for being late. She did not recall telling Mr. McCool it was around 6:00 or 6:15 a.m. (RR Vol. 3, p. 123-125) Defendant left her to go over to O'Quinn Street for about five to ten minutes. He did not specify what he was doing. (RR Vol. 5, p. 9) She believed he was on a bicycle. She wasn't sure if that was the same day that the 906 O'Quinn house almost caught fire, but the Keltys fire was later that day. Ms. Siggers testified that the defendant was at his mother's house at the time of the Keltys fire. She saw fire trucks in the daytime. (RR Vol. 5, p. 10) When they saw the fire trucks, the defendant asked her to ride down there to see what was going on and let him know. The defendant asked her a lot of questions, but they were standing together and the defendant did not go see the fire. After she went to look at the fire trucks, she told the defendant that the house on Carver and Keltys was on fire and they left. He went to his mother's house which is on the other end of Keltys. (RR Vol. 5, p. 11).

Mr. Owens did not see anybody set the fires. (RR Vol. 4, p. 13-17) Officer Abbot identified some phlegm that appeared fresh, and directed that a swab be collected. The swab was entered into evidence and transported to DPS for analysis. (RR Vol. 4, p. 29-32) Ms. Dunton testified that the defendant could not be excluded as a contributor of the profile, and to a reasonable degree of scientific

34.

certainty, the defendant is the source. (RR Vol. 4, p. 86-88) Ms. Dunton testified that the DNA profile from the black cloth was consistent with a mixture and that the defendant cannot be excluded as a contributor to the profile, but there was an unknown portion of this profile that could potentially be compared to at least one other contributor. (RR Vol. 4, p. 88-90)On cross examination, Ms. Dunton testified that it was not possible for her to determine how long DNA had been on a particular object. The witness stated that many variables were involved in transferring DNA to the black cloth, including how long he touched it. She stated that certain people shed DNA more than others. (RR Vol. 4, p. 92) The witness testified that the cloth had DNA from at least two people, but could have been more than two people. She was not asked to compare the DNA profile to anyone other than the defendant. Ms. Dunton stated that it is possible to have tested a cigarette lighter, a gas can, a cigarette butt, plywood, or newspaper for DNA.

In regard to the face book evidence Ms. Hamilton did not see the defendant post anything to Facebook with his phone while he was in the hospital. Ms. Hamilton testified that she looked at her Facebook page after she returned home and saw posts from the defendant. She was unaware of any photographs taken of the defendant at the hospital. (RR Vol. 5, p. 16-18) Ms. Hamilton viewed State's Exhibit 24D, being a picture of the defendant, apparently taken at the hospital, but she did not know who had taken the picture. She had heard of the defendant's user name jboyheartofthanorth, but did not know whether he used it as his e-mail address. She stated that she had been convicted of tampering with evidence the previous year. (RR Vol. 5, p. 19-20)

Mr. McCool testified that he considered suspects other than the defendant, including Ms. Siggers. (RR Vol. 5, p. 36-37) Mr. McCool suspected Ms. Siggers

35.

may have been present at the Owens' Club and Cottonbelt fires. He considered her alibis for the remaining fires were sufficient and was confident that she had no involvement. The witness stated that if he recalled correctly, the defendant also said that she was at his house during the time of the Owens' Club and Cottonbelt fires. (RR Vol. 5, p. 38) Mr. McCool viewed State's Exhibit 25, the defendant's Facebook page that he printed. (RR Vol. 5, p. 39) State's Exhibit 23, Yahoo records for e-mail address jboyofthanorth@yahoo.com, were admitted. (RR Vol. 5, p. 41) Mr. McCool testified that this e-mail address is the same that is linked to the defendant's Facebook page. (RR Vol. 5, p. 42) Mr. McCool viewed State's Exhibits 24A through 24I, pictures off of the defendant's Facebook page. Some of the photographs appear to be selfies. At least one of the photographs was taken immediately preceding the days the fires occurred. Prosecution offered State's Exhibit 25. (RR Vol. 5, p. 43)

The face book postings could obviously be considered damning evidence. Over defense objection and argument postings were allowed into evidence. Appellant addresses this as issue 3. Mr. McCool read from State's Exhibit 25A, a posting under defendant's name being "No tell your brother im ready to put a match to Lufkin tx and watch this muthafucka burn down su wuu biz." State's Exhibit 25B included another posting on that same date saying "Enjoy a peaceful night get plenty of sleep because after tonight some of you will see heaven the rest of you go burn ya go burn slow." State's Exhibit 25C included a third posting on the same date by defendant saying "I'm alive and all you muthafucka who want me dead you go die before me one by one lord forgive me for my sins." Appellant argues without this allowed evidence the State had less than a scintilla of evidence to connect appellant as a suspect of the arsons'. Being unauthenticated as argued appellant argues this evidence should not have been considered. This will be

36.

addressed in issue 3.

In addition several items were not subjected to DNA testing. Ms. Dunton stated that it is possible to have tested a cigarette lighter, a gas can, a cigarette butt, plywood, or newspaper for DNA. The floor mat collected at Owens' Club found on the roof that was on fire was not submitted for DNA analysis. A piece of paper sack that had been stuffed in the doorway and set on fire at Owens' Club was not submitted for DNA analysis. The tire that was set up against the house at 906 O'Quinn was not submitted for DNA analysis. Mr. McCool testified that neither of the gas caps from that location was submitted for DNA analysis. (RR Vol. 5, p. 49-54) Mr. McCool stated that he interviewed the defendant at his residence at 10:32 a.m. on November 14, 2012, after the first three fires. (RR Vol. 5, p. 54-56) The witness testified that the distance between Lanzy's Bar and Cottonbelt, based on the map, is about five blocks. He did not walk the distance. Lanzy's fire occurred at approximately 6:31 a.m., the Cottonbelt fire was discovered at approximately 6:50 a.m., and the 813 Keltys fire was discovered at approximately 6:30 a.m. (RR Vol. 5, p. 57-58) Regarding Ms. Siggers, the witness checked out where she was during the fires primarily through statements made by people. Mr. McCool stated that he didn't really recall who he spoke with regarding Ms. Siggers nor whether any of them testified in court. (RR Vol. 5, p. 59-60) Mr. McCool testified that he did not obtain a DNA sample from Ms. Siggers, although the DNA profile showed more than one person. (RR Vol. 5, p. 61)

Appellant argues there obviously was a lack of evidence as recognized by the jury in counts3 and 6. Appellant argues no rational trier of fact could determine a consistent set of facts of which could be believed beyond a reasonable doubt. Thus, pursuant to Williams v. State, Gonzales v. State and Jackson v. Virginia, supra, appellant argues there is a "mere modicum' of evidence probative of the

37.

element of the direction of the discharge as well hereinafter be addressed.

Appellant argues the jury could not as a rational fact finder have found the elements of the offense as alleged in the indictment to have been shown beyond a reasonable doubt. Appellant argues the witnesses' testimony is inconsistent and no one actually sees the appellant start a fire. At best the testimony may show appellant was at some time near the location of the fires by virtue of his sputum and a cloth/rag found. However, the sputum was located a distance away and the cloth/rag was not shown to have been touched exclusively by the appellant.

Appellant argues the wrongful admission of the Facebook evidence highly prejudiced his chances of a fair trial. In the instant matter when considering "the evidence in the light most favorable to the prosecution," appellant argues the evidence (as reviewed above) is insufficient to establish that appellant committed arson and that the State provided sufficient evidence to support the jury's finding of guilt. Jackson, 443 U.S. at 319; supra. Appellant realizes, "No certain quantity of corroborating evidence is required. Malone v. State, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) Appellant argues as such this Honorable court must "ensure that the evidence presented actually supports a conclusion that the defendant committed the crime. (as alleged) Williams v. State, supra. Appellant argues for this Honorable Court to reverse the finding of guilt and acquit the Appellant.

## Issue 2

### The trial court erred in permitting impermissible impeachment evidence.

The trial court erred in allowing hearsay evidence as impeachment evidence of Mr. Davis and Ms. Hamilton regarding 613(a) of the Texas Rules of Evidence. The trial court agreed it should have limited Mr. McCool's statements regarding

38.

his discussion with Mr. Davis to impeachment purposes. (RR Vol. 3, p. 98) James "Baski" Davis, testified that he had lived in Lufkin all of his life and identified the defendant as Stanford Jones. (RR Vol. 3, p. 54-62) He remembered the fire, but he wasn't with and did not see the defendant. He got up around 4 a.m. and saw somebody, wearing a hood, riding a bike, coming off of Keltys behind the house. When he got off work that evening, the house was gone. He had told the Fire Marshal, Steve McCool, about seeing someone on a bicycle. (RR Vol. 3, p. 57-58) The defense attorney objected to the witness testifying to what he had said on another occasion outside of court as being hearsay, unless being offered for a limited purpose. The court allowed the testimony for the limited purpose of impeaching the credibility of the witness. (RR Vol. 3, p. 58-59) Mr. Davis testified that he had spoken with the Fire Marshall in person and had viewed a photograph of more than one person. Mr. Davis stated that he did not recall telling the Fire Marshall who was on the bicycle. He did recall telling the Fire Marshall that the defendant was a classmate. The witness testified that he did not know why the Fire Marshall was talking to him and that he did not recall helping him with the investigation. (RR Vol. 3, p. 60-62) The prosecutor asked Mr. McCool what Mr. Davis had told him. (RR Vol. 3, p. 82)

The defense attorney objected on the basis of hearsay and violation of the Sixth Amendment right to confrontation to admit that for the truth of the matter asserted. (RR Vol. 3, p. 82)

During a bench conference, defense counsel stated that the prior statement by Mr. Davis was being offered for all purposes, not just impeachment. The court noted defense counsel's objection due to hearsay, and overruled the objection due to violation of the right to confrontation. (RR Vol. 3, p. 83-86)

Mr. McCool stated that when he called Mr. Davis, Mr. Davis stated that he

had some information. (RR Vol. 3, p. 87) Mr. McCool met Mr. Davis who said that he saw a man on a blue bicycle go behind the house that caught fire. Mr. Davis viewed a picture produced by Mr. McCool of the defendant taken at an LPD interview room and identified the person in the picture as the defendant. (RR Vol. 3, p. 88) The witness stated that Mr. Davis said that the defendant was the person riding the bicycle and that they had been classmates. Mr. Davis also told him what the bicyclist was wearing, his build, and told him to look at his Facebook page. (RR Vol. 3, p. 89) Defense counsel objected and asked that the jury be instructed to disregard the last statement. The Court instructed the jury to disregard the last question and response. Defense counsel moved for a mistrial which the court denied. (RR Vol. 3, p. 89) ) Secondly, Michelle Dupree testified she is a good friend with defendant. (RR Vol. 3, p. 120-126) On the morning of November 15, 2012, she recalled dropping the defendant off at his home around 7:15 to 7:30 a.m., and he went to the backyard, she believed to get in the house. She then went home to change clothes prior to going to class at Angelina College. She remembered it was around that time because she was five minutes late to class and was reprimanded for being late. She did not recall telling Mr. McCool it was around 6:00 or 6:15 a.m. (RR Vol. 3, p. 123-125)

Appellant argues on appeal that the hearsay statements of Officer McCool were not admissible to show as a prior inconsistent statement of Mr. James Davis or Ms. Hamilton. Appellant argues the State failed to lay the proper foundation and that the statement is not inconsistent with Mr. Davis's trial testimony. The appellant argues that the state failed to lay the proper foundation because the witness simply could not remember what he said to Officer McCool. Ms. Hamilton clarified her statement.

Appellant argues the trial court abused its discretion in allowing Mr.

40.

McCool's testimony in both matters. Martinez v. State, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Appellant understands an abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." Taylor v. State, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). Appellant is not asking this court to substitute its own decision for that of the trial court .Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)   Rule 613(a) of the Texas Rules of Evidence imposes three requirements to establish the proper predicate or foundation for impeachment testimony: (1) identification ("the time and place and the person to whom [the statement] was made"), (2) "the contents of such statement," and (3) the witness "must be afforded an opportunity to explain or deny such statement." TEX. R. EVID. 613(a); see Ellingsworth v. State, 487 S.W.2d 108, 112 (Tex. Crim. App. 1972); Osteen v. State, 61 S.W.3d 90, 91 (Tex. App.—Waco 2001, no pet.). The plain language of Rule 613(a) does not require the witness to deny the statement, it only provides that extraneous evidence may not be admitted if "the witness unequivocally admits having made such statement." TEX. R. EVID. 613(a). This did not occur in the instant matter as shown above. Neither denied speaking to Officer McCool. Mr. Davis could not remember and Ms. Hamilton explained her answer but neither admitted making the statements attributed to them.

It does not appear the state laid its predicate by confronting either witness with their alleged statements to Officer McCool and thus the officer's testimony should have been excluded. Rule 613(a) provides. If the impeaching party fails to lay a proper predicate or foundation, the prior inconsistent statement should not be

41.

admitted. Moore v. State, 652 S.W.2d 411, 413 (Tex. Crim. App. 1983); Osteen v. State, 61 S.W.3d 90, 91,supra.

**Issue 3**

**The trial court erred in allowing face book prints which were not properly authenticated**.

Mr. McCool viewed State's Exhibit 25, the defendant's Facebook page that he printed. (RR Vol. 5, p. 39) State's Exhibit 23, Yahoo records for e-mail address jboyofthanorth@yahoo.com, were admitted. (RR Vol. 5, p. 41) Mr. McCool testified that this e-mail address is the same that is linked to the defendant's Facebook page. (RR Vol. 5, p. 42) Mr. McCool viewed State's Exhibits 24A through 24I, pictures off of the defendant's Facebook page. Some of the photographs appear to be selfies. At least one of the photographs was taken immediately preceding the days the fires occurred. Prosecution offered State's Exhibit 25. (RR Vol. 5, p. 43)

Appellant argues the face book evidence was unauthenticated pursuant to Rule 901. The Court ruled that proper predicate had been established, overruled defense counsel's objection, and admitted State's Exhibit 25. (RR Vol. 5, p. 44) Defense counsel requested a running objection to all references to the material which the Court noted. State's Exhibits 25A through 25C, presumably printouts of defendant's Facebook page, also being referred to as 25, were admitted and objection noted. (RR Vol. 5, p. 45)

.

Appellant understands "the issue of authentication arises when the relevancy of any evidence depends upon its identity, source, or connection with a particular person, place, thing, or event.'" Campbell v. State, 382 S.W.3d 545, 548-49 (Tex.

42.

App.-Austin 2012, no pet.) (quoting <u>Shea v. State</u>, 167 S.W.3d 98, 104 (Tex. App.-Waco 2005, pet. ref'd)). "Evidence has no relevance if it is not authentically what its proponent claims it to be." <u>Tienda v. State</u>, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Rule 901(a) of the Texas Rules of Evidence provides that for a party to satisfy the requirement of authenticating or identifying an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). Rule 901(b) includes a list of evidence that satisfies this requirement, including testimony that an item is what it is claimed to be and evidence of the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item.

Mr. McCool viewed State's Exhibits 25A through 25C, stated that these were printouts of defendant's Facebook page, and dated November 11, 2012, the date the defendant was in the hospital. Mr. McCool read from State's Exhibit 25A, a posting under defendant's name being "No tell your brother im ready to put a match to Lufkin tx and watch this muthafucka burn down su wuu biz." State's Exhibit 25B included another posting on that same date saying "Enjoy a peaceful night get plenty of sleep because after tonight some of you will see heaven the rest of you go burn ya go burn slow." State's Exhibit 25C included a third posting on the same date by defendant saying "I'm alive and all you muthafucka who want me dead you go die before me one by one lord forgive me for my sins." Mr. McCool stated that he interviewed at least 35 people, and multiple people told him to look at the defendant's Facebook page. Defense counsel objected, the Court sustained. Defense counsel asked the Court to instruct the jury to disregard. The Court instructed the jury to disregard the questions and answers regarding interviewees who told Mr. McCool to look at defendant's face book page. Defense counsel

moved for a mistrial, which the Court denied. (RR Vol. 5, p. 46-48) Ms. Runnels stated that, while in the hospital, the defendant talked on his phone some, but that she did not see him using Facebook. (RR Vol. 4, p. 65) She stated that if there were some behavior that she didn't like, she would address that face-to-face, not through Facebook. (RR Vol. 4, p. 66) The witness stated that she could go onto her son's Facebook page and type, email or post anything she wanted without his password. (RR Vol. 4, p. 68-70)During a bench conference, defense counsel objected to testimony regarding the content of the Facebook postings since there was an issue about authentication that the Court had not ruled on as part of his motion in limine. The Court stated that the prosecution needed to establish the predicate of the Facebook posting and then defense counsel can make his objection. (RR Vol. 4, p. 66-67)

Ms. Hamilton did not see the defendant post anything to Facebook with his phone while he was in the hospital. Ms. Hamilton testified that she looked at her Facebook page after she returned home and saw posts from the defendant. She was unaware of any photographs taken of the defendant at the hospital. (RR Vol. 5, p. 16-18) Ms. Hamilton viewed State's Exhibit 24D, being a picture of the defendant, apparently taken at the hospital, but she did not know who had taken the picture. She had heard of the defendant's user name jboyheartofthanorth, but did not know whether he used it as his e-mail address. She stated that she had been convicted of tampering with evidence the previous year. (RR Vol. 5, p. 19-20) Appellant contends the trial court erred in admitting prints/photographs taken of his computer screen depicting the face book statements he allegedly posted, because the prints were not properly authenticated.

Although the content of the messages at issue purport to be messages posted on a face book account bearing appellant's name; the appellant's mother

44.

testified anyone could post on the face book. Appellant argues there was not sufficient circumstantial evidence such that a reasonable juror could have found that the messages were authored and sent by appellant. Tienda v. State , 358 S.W.3d 633,supra. Therefore, appellant argues the improper admission of the Facebook prints impermissibly prejudiced the appellant in receiving a fair trial and cumulatively with the admission of the improper impeachment testimony as argued previously as well as lack of direct evidence should result in appellants acquittal.

## PRAYER

Appellant Stanford Jones Sr. argues that the decision of the jury is not supported by legally sufficient evidence. Therefore, appellant asks that this judgment be reversed and the appellant acquitted of counts I, 2 and 5 of Arson. Further, appellant requests this Honorable Court to grant such other and further relief to which Appellant is justly and equitably entitled.

Respectfully, Submitted:
*/S/ John D. Reeves*
JOHN D. REEVES
Attorney at Law
1007 Grant Ave.
Lufkin, Texas 75901
Phone: (936) 632-1609
Fax: (936) 632-1640
SBOT # 16723000
Email:        tessabellus@yahoo.com
**ATTORNEY FOR APPELLANT**

45.

## CERTIFICATE OF COMPLIANCE

I, John D. Reeves Counsel for appellant hereby certify that this brief exclusive of the rule provisions that do not provide counting contains 14,472 words.

/S/ John D. Reeves
John D. Reeves

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Appellant's Brief on this 15th day of October has been forwarded to the State's Counsel, April-Ayers-Perez, Assistant District Attorney of Angelina County, by E filing service .

/S/ John D. Reeves
John D. Reeves